# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56665-6-II |
| Respondent, | |
| v. | |
| ROGER KAREEM WOODARD, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J. — Kristina Woodard lived with her three children.[1] Roger Woodard, Kristina's former husband and the children's father, was staying in Kristina's home when he forced his way into Kristina's bedroom and stabbed her multiple times. The State charged Roger with attempted first degree murder, first degree kidnapping, and first degree burglary. The charging document alleged that a domestic violence aggravator applied to the attempted murder charge. Roger waived his right to a jury trial. After a bench trial, the trial court convicted Roger of all three charges. It imposed an exceptional sentence upward and a lifetime no-contact order covering Kristina and the three children.

Roger appeals his convictions and sentence. He argues that he did not validly waive his right to have a jury decide whether the domestic violence aggravator applied. Additionally, he argues that his convictions for first degree attempted murder and first degree kidnapping violate

---

[1] To avoid confusion, we refer to the parties by their first names.

his right to be free from double jeopardy, so the kidnapping conviction must be vacated. Alternatively, he argues that because the attempted murder and kidnapping convictions encompassed the same criminal conduct, they should count as one offense for the purpose of calculating his offender score. Roger raises a number of other arguments in a statement of additional grounds for review (SAG), including an assignment of error to the portion of the lifetime no-contact order covering his children.

We remand for the trial court to consider on the record whether the challenged portion of the no contact-order banning contact with Roger's children for life was reasonably necessary in light of Roger's fundamental right to parent. The court should modify the no-contact order if necessary. We otherwise affirm.

FACTS

I. BACKGROUND

The trial court found the following facts, and they are unchallenged on appeal. Roger and Kristina were a divorced couple. They shared three children: DW, BW, and VW. At the time of the incident that led to Roger's convictions, DW was nine years old, BW was three years old, and VW was one years old.

In September 2019, Roger was temporarily living with Kristina and the children after being evicted from his apartment. Kristina gave Roger "until the end of September to find a new place." Clerk's Papers (CP) at 68 (Finding of Fact (FF) I.). She told him "he could sleep in the upstairs loft or on the downstairs couch." *Id.* She did not allow him to sleep in her bedroom. The bedroom, which was upstairs, "had a locked door, and Kristina was the only person with a key." *Id.* Kristina locked the bedroom's door whenever she left her home and whenever she was in the bedroom.

## II. INCIDENT

Toward the end of September, Roger forced his way into Kristina's suite and slashed her with a knife. Kristina screamed for DW to call 911. DW appeared "with a phone but could not unlock it." CP at 69 (FF III., IV.). Roger grabbed DW's shirt, took the phone, and "told DW to go downstairs and quiet his sisters . . . who were crying in the living room." *Id.* (FF IV.).

After DW went to his sisters, "Kristina managed to slide down the stairs, but [Roger] sat on her thighs so she could not get out." *Id.* (FF IV.). Roger continued slashing her. "Kristina attempted to go to the front door to get out, but [Roger] prevented her from leaving." He put the knife to Kristina's face and said, "'[D]on't make me do this.'" CP at 69 (FF IV.).

Roger eventually went to the three children, who were sitting on the couch. "Kristina went to the front door again, but [Roger] closed it shut and forced her to stay inside the residence." *Id.* (FF V.) The children were screaming and looking at Kristina. When Kristina escaped to the backyard, Roger followed her, stabbed her several more times, and then walked away from the house.

Neighbors came to help Kristina, and paramedics transported her to the hospital with life-threatening injuries. Kristina's injuries included "deep lacerations to her face, a deep laceration across her throat, a stab wound to her mouth, a stab wound to the chest resulting in a collapsed lung, and a stab wound to the abdomen." CP at 71. (FF X.).

## III. CHARGES AND JURY TRIAL WAIVER

The State charged Roger with attempted first degree murder, first degree kidnapping, and first degree burglary, all with deadly weapon enhancements. The charging document alleged that the attempted murder involved domestic violence and that at least one of the following

circumstances applied: the "offense was part of an ongoing pattern of . . . abuse of the victim manifested by multiple incidents over a prolonged period of time;" the "offense occurred within sight or sound of the victim's . . . minor children;" or Roger's "conduct during the commission of the . . . offense manifested deliberate cruelty or intimidation of the victim." CP at 6. A crime involves domestic violence when it is committed by "one intimate partner against another intimate partner." Former RCW 10.99.020(5) (2019). Intimate partners include former spouses and individuals with a child in common. Former RCW 10.99.020(7); former RCW 26.50.010(7) (2019).

Roger waived his right to a jury trial. He signed and filed a written waiver:

1. I have been informed and fully understand that I have the right to have my case heard by an impartial jury selected from the county where the crime(s) is alleged to have been committed:

2. I have consulted with my lawyer regarding the decision to have my case tried by a jury or by the court;

3. I freely and voluntarily give up my right to be tried by a jury and request trial by the court.

CP at 16.

At a hearing on the waiver, defense counsel told the trial court, "Mr. Woodard has received, I can assure the bench, more advisement on this case, both written and oral, than any client in the Pierce County Jail." Verbatim Rep. of Proc. (VRP) (Sept. 21, 2021) at 33. In a colloquy with the judge, Roger confirmed that he signed the waiver, that he went over it with his attorney, and that he was able to ask any questions he had about it.

The trial court asked, "You understand that, constitutionally, you have the right to a jury trial, and that right exists for your benefit. Do you understand?" VRP (Sept. 21, 2021) at 34. Roger

answered affirmatively. He also confirmed that he wished to waive his right to a jury trial and have a bench trial. The trial court found that Roger's waiver was "done knowingly, intelligently, and voluntarily." VRP (Sept. 21, 2021) at 35.

At the end of the hearing, defense counsel acknowledged, "[I]n the event the [State] prevails, they're going to be asking for an exceptional sentence that would approach a century in prison." VRP (Sept. 21, 2021) at 36.

### IV. TRIAL COURT FINDINGS AND SENTENCING

After a bench trial, the trial court entered findings consistent with the facts described above and found Roger guilty of attempted first degree murder, first degree kidnapping, and first degree burglary. The trial court concluded that Roger was armed with a deadly weapon during the commission of each crime.

A person is guilty of attempted first degree murder when they form a premeditated intent to cause another person's death and take a substantial step to cause that person's death. RCW 9A.32.030(1)(a); *see also In re Pers. Restraint of Borrero*, 161 Wn.2d 532, 537-38, 167 P.3d 1106 (2007). The trial court found that Roger "took a substantial step of slashing Kristina numerous times on her face and neck, and stabbed her in the chest, abdomen, and mouth." CP at 71 (FF XII.). It found that Roger "intended to commit the crime . . . as evidenced by the deliberate nature of the attack and the severity of the wounds[,] to include a severe cut across Kristina's throat." *Id.* It added that "the intent to cause Kristina's death was premeditated" because Roger "walked upstairs to confront Kristina already armed with a knife and continued his attack throughout the home and into the backyard." *Id.* And the trial court found that the domestic violence aggravator applied, finding that Kristina and the defendant were intimate partners because they "were former spouses

5

and had three children together," that Roger attempted to murder Kristina "within the sight and sound of Kristina's three children," and that Roger's conduct "manifested deliberate cruelty towards [Kristina] as evidenced by the serious nature of the injuries." CP at 72 (FF XII.).

A person is guilty of first degree kidnapping when they intentionally abduct "another person with intent . . . [t]o inflict bodily injury on" them. RCW 9A.40.020(1)(c). The trial court found that Roger "restrained Kristina's movements by using and threatening to use deadly force," noting that Roger held a knife to her face and said, "'[D]on't make me do this'" when she tried to leave her home; shut the door, pushed Kristina to the floor, and slashed her throat when she tried to leave again; and stabbed Kristina in the chest during her "third attempt to escape." CP at 72-73 (FF XIII.). The trial court added that Roger "kept Kristina in the home knowing she was in a place where no one would likely find her and took away her ability to get help through her son." CP at 73 (FF XIII.).

At sentencing, defense counsel argued for a standard range sentence, stating that the range was "massive" and that it gave the trial court "plenty of discretion." VRP (Feb. 4, 2022) at 10-11. The trial court decided to impose an exceptional sentence upward. In the judgment and sentence, the trial court found that substantial and compelling reasons justified an exceptional sentence upward for attempted first degree murder, checking a box next to the following statement: "Aggravating factors were . . . found by the court after the defendant waived jury trial." CP at 55.

The trial court sentenced Roger to 340 months for the attempted first degree murder conviction and 68 months for the first degree kidnapping conviction, which would be served consecutively. The trial court imposed 116 months running concurrently for the first degree burglary conviction. For the three deadly weapon enhancements, the trial court sentenced Roger

to three consecutive terms of 24 months. The total term of confinement was 480 months. The trial court also imposed a lifetime no-contact order covering Kristina, DW, BW, and VW.

Roger appeals his convictions and sentence.

ANALYSIS

I. WAIVER OF RIGHT TO A JURY TRIAL

Roger argues that his jury trial waiver was invalid, contending that the "State cannot prove that [he] waived his right to have a jury decide whether" any aggravating factors supported an exceptional sentence. Br. of Appellant at 12. Roger also points out that the trial court erroneously failed to enter written findings to support the exceptional sentence it imposed. The State concedes that the trial court was required to enter written findings and contends that the "remedy for failure to enter written findings of fact and conclusions of law is to remand the case for entry of those findings and conclusions." Br. of Resp't at 30. We hold that Roger validly waived his right to a jury trial and that remand is unnecessary under the facts of this case.

An appellant may argue for the first time on appeal that the record is insufficient to satisfy the constitutional requirements for waiver of the right to a jury trial. *State v. Cham*, 165 Wn. App. 438, 446-47, 267 P.3d 528 (2011). "We review the sufficiency of the record to establish a valid waiver de novo." *Id.* at 447.

A "defendant has the right to a jury trial on any aggravating factor that supports an exceptional sentence, except the fact of a prior conviction." *Id.* at 446. With a few exceptions, RCW 9.94A.535(3) provides "an exclusive list of" aggravating "factors that can support a sentence above the standard range."

For a waiver of the right to a jury trial to be valid, the "record must adequately establish that" the waiver was knowing, intelligent, and voluntary. *State v. Benitez*, 175 Wn. App. 116, 128, 302 P.3d 877 (2013). "The State bears the burden of establishing a valid waiver, and absent a record to the contrary," we indulge "in every reasonable presumption against waiver." *Cham*, 165 Wn. App at 447. Where a defendant waives their right to a jury trial, the trial court does not need to engage in a colloquy or give "'on-the-record advice as to the consequences of [the] waiver.'" *Id.* (quoting *State v. Stegall*, 124 Wn.2d 719, 725, 881 P.2d 979 (1994)). A record sufficiently demonstrates a waiver's validity if it "'includes either a written waiver signed by the defendant, a personal expression by the defendant of an intent to waive, or an informed acquiescence.'" *State v. Trebilcock*, 184 Wn. App. 619, 632, 341 P.3d 1004 (2014) (quoting *Cham*, 165 Wn. App. at 448).

For example, in *Trebilcock*, we held that a defendant validly waived her right to a jury trial on aggravating factors even though her waiver occurred before the State amended the charging document, during her bench trial, to add the aggravating factors. 184 Wn. App. at 632-33. We reasoned that the defendant signed a written waiver, defense counsel said the parties had discussed the decision to waive "over a period of months," the defendant said on the record that she understood the right she was waiving, the defendant did not move to rescind her waiver when the State amended the charging document during trial to add aggravating factors, and defense counsel indicated multiple times during trial and sentencing that the defendant understood and agreed that a judge would decide the aggravating factors. *Id.*

In contrast, in *State v. Hos*, we held that a jury trial waiver was invalid. 154 Wn. App. 238, 252, 225 P.3d 389 (2010). There, the defendant "did not sign a written jury trial waiver" and the

trial court did not question the defendant "on the record to determine whether she knowingly, intelligently, and voluntarily waived her right to a jury trial, or even whether she had discussed the issue with her defense counsel or understood what rights she was waiving." *Id.*

Here, the record demonstrates that Roger validly waived his right to a jury trial. Unlike in *Hos*, the record contains both a signed written waiver and Roger's personal expression of an intent to waive the right. The written waiver was broad, stating that Roger understood that he had "the right to have [his] *case* heard by an impartial jury," that he had consulted with defense counsel "regarding the decision to have [his] *case* tried by a jury," and that he was "freely and voluntarily" giving up that right. CP at 16 (emphasis added). At a hearing on the waiver, defense counsel said, "Mr. Woodard has received, I can assure the bench, more advisement on this case, both written and oral, than any client in the Pierce County Jail. . . . He is doing so knowingly, intelligently, and voluntarily." VRP (Sept. 21, 2021) at 33. Roger confirmed he was able to review the waiver with defense counsel and ask any questions he had about it. Later in the hearing, defense counsel said, "[I]n the event the [State] prevails, they're going to be asking for an exceptional sentence that would approach a century in prison," thus acknowledging the likelihood of an exceptional sentence if the charged aggravators were found. VRP (Sept. 21, 2021) at 36.

Additionally, unlike the defendant in *Trebilcock*, Roger was aware of the domestic violence aggravator during the waiver, which took place about three weeks before his trial began. At the time of the waiver, the most current charging document alleged that the domestic violence aggravator applied to the attempted murder charge. The two subsequent charging documents made the same allegation. Thus, his "case" inherently included the aggravator.

We hold that Roger validly waived his right to have a jury determine whether the domestic violence aggravator applied. The State correctly notes that RCW 9.94A.535 required the trial court to enter written findings of fact and conclusions of law in support of the exceptional sentence it imposed. But remand for entry of *separate* findings and conclusions is not needed where a trial court enters the written findings necessary to support an aggravator after a bench trial and the judgment and sentence explains that the exceptional sentenced is based on the aggravator. RCW 9.94A.535(2). In this case, after the bench trial, the trial court entered written findings in support of the domestic violence aggravator: Roger committed attempted first degree murder within sight of the children, who could see their mother as she was being attacked, and Roger's conduct manifested deliberate cruelty. CP at 72, 74-75 (describing the attack in detail). While the trial court did not expressly state that it imposed the exceptional sentence because of the domestic violence aggravator, the judgment and sentence contains language explaining that the exceptional sentence was based on the aggravator the court found after Roger waived a jury trial. Separate findings and conclusions would therefore be superfluous here.

We affirm Roger's sentence.

## II. DOUBLE JEOPARDY

Roger argues that the trial court violated his rights under the double jeopardy provisions of the federal and state constitutions when it imposed consecutive sentences for the first degree kidnapping conviction and the attempted first degree murder conviction. He contends that the conduct that gave rise to the kidnapping and attempted murder charges constituted a single offense. We disagree.

10

We "*may* refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a) (emphasis added). Although Roger did not argue below that his double jeopardy rights were violated, the State concedes, and we agree, that a defendant may raise a double jeopardy claim for the first time on appeal. *State v. Brewer*, 148 Wn. App. 666, 673, 205 P.3d 900 (2009).

A.      Double Jeopardy Principles

The United States Constitution and the Washington Constitution provide defendants coextensive protections from double jeopardy. U.S. CONST. amend. V; WASH. CONST. art. I, § 9; *State v. Reeder*, 184 Wn.2d 805, 825, 365 P.3d 1243 (2015). In part, they protect a defendant from "multiple punishments for the same offense, imposed at a single criminal proceeding." *State v. Potter*, 31 Wn. App. 883, 886, 645 P.2d 60 (1982).

"Within constitutional constraints, the legislative branch has the power to define criminal conduct and assign punishment for such conduct," so we cannot resolve a double jeopardy question "without determining what punishments the legislative branch has authorized." *State v. Calle*, 125 Wn.2d 769, 776, 888 P.2d 155 (1995).

Where conduct violates two separate statutes, we look to the language of those statutes to determine whether the legislative branch intended to allow multiple punishments for the conduct. *State v. Louis*, 155 Wn.2d 563, 569, 120 P.3d 936 (2005). When examining legislative intent does not explicitly resolve the issue, we apply the *Blockburger*[2] test. *In re Pers. Restraint of Knight*, 196 Wn.2d 330, 337, 473 P.3d 663 (2020); *State v. Freeman*, 153 Wn.2d 765, 776, 108 P.3d 753 (2005). Here, the State concedes that the legislature did not authorize cumulative punishments for first degree kidnapping and attempted first degree murder.

---

[2] *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

Under *Blockburger*, if a defendant's crimes "are the same in law and in fact, they may not be punished separately absent clear legislative intent to the contrary." *Freeman*, 153 Wn.2d at 777. We consider the elements of each crime as charged and proved, not simply at "the level of an abstract articulation of the elements." *Id.* If "'each offense, as charged, includes elements not included in the other, the offenses are different and multiple convictions can stand.'" *State v. Peña Fuentes*, 179 Wn.2d 808, 824, 318 P.3d 257 (2014) (quoting *Calle*, 125 Wn.2d at 777). But even if the evidence needed to support a conviction for one of the crimes would have been sufficient to warrant a conviction for the other crime, we determine whether each conviction required proof of a fact that the other did not. *Freeman*, 153 Wn.2d at 772. If the record demonstrates that the State relied on distinct acts to prosecute each separate offense, the offenses are not the same in fact, and our double jeopardy inquiry ends. *See Peña Fuentes*, 179 Wn.2d at 826.

For example, in *In re Pers. Restraint of Orange*, the Washington Supreme Court held that the defendant's convictions for attempted first degree murder and first degree assault violated double jeopardy where both "crimes were based on the same shot directed at the same victim, and the evidence required to support" the attempt conviction was sufficient to support the assault conviction. 152 Wn.2d 795, 820, 100 P.3d 291 (2004).

In contrast, the court held in *Borrero* that the defendant's convictions for attempted first degree murder and first degree kidnapping with intent to facilitate robbery did not violate double jeopardy where the defendant threatened a person with a firearm, tied him up, took his cannabis, and threw him into a river. 161 Wn.2d at 534-35, 540. Although the charging document listed the elements of both crimes "in only 'generic' terms," the court reasoned that proof the defendant threw a bound person into a river supported attempted murder but not kidnapping with intent to

facilitate robbery. *Id.* at 539. And it reasoned that proof the defendant tied the person up and took his cannabis while threatening him with a firearm supported kidnapping with intent to facilitate robbery but not attempted murder. *Id.*

B.    First Degree Kidnapping and Attempted Murder

We agree with the parties that the legislature has not explicitly disclosed its intent with respect to multiple punishments for first degree kidnapping and attempted first degree murder, so we must apply the *Blockburger* test. *See id.* at 536-38 (applying the *Blockburger* test where the defendant argued that his convictions for attempted first degree murder and first degree kidnapping violated double jeopardy).

Under the *Blockburger* test, the trial court did not violate double jeopardy. First degree murder and first degree kidnapping are not the same in law or in fact. They are not the same in law because each offense includes elements not included in the other. A person is guilty of first degree kidnapping under RCW 9A.40.020(1)(c) when they intentionally abduct "another person with intent . . . [t]o inflict bodily injury on [them]." To "[a]bduct" is "to *restrain* a person by either (a) secreting or *holding [them] in a place where [they are] not likely to be found*, or (b) using or threatening to use deadly force." RCW 9A.40.010(1) (emphasis added). In contrast, a person is guilty of attempted first degree murder under RCW 9A.32.030(1)(a) when they form a premeditated intent to cause another person's death and take a substantial step to cause that person's death. *See Borrero*, 161 Wn.2d at 537-38. Unlike attempted first degree murder, first degree kidnapping requires proof that the defendant restrained someone. And unlike first degree kidnapping, attempted first degree murder requires proof of premeditated intent to cause a person's death. These offenses are thus not the same in law.

Moreover, the offenses are not the same in fact. The trial court's findings show that the State relied on distinct acts to prosecute Roger for first degree kidnapping and attempted first degree murder. The trial court supported the first degree kidnapping conviction by finding, among other things, that Roger held Kristina in a place where she was unlikely to be found: he prevented DW from calling 911 and he shut the front door when Kristina tried to leave her house. These facts were necessary for finding that Roger restrained Kristina, but they were not necessary for supporting the attempted first degree murder charge. Moreover, the trial court supported the attempted first degree murder charge by finding that Roger formed a premeditated intent to cause Kristina's death. Specifically, it found that "the deliberate nature of the attack and the severity of the wounds," including "a severe cut across Kristina's throat," showed Roger's "intent to cause Kristina's death." CP at 71 (FF XII.) And it found that the intent was premeditated because Roger was armed with a knife when he first confronted Kristina and Roger "continued his attack throughout the home and into the backyard." *Id.* Proof that the attack was severe enough to show intention to kill was not necessary for supporting the first degree kidnapping charge, which required proof of an intent to inflict bodily injury but not proof of an intent to cause death. And, as stated above, convicting Roger of first degree kidnapping did not require proof of his premeditated intent to cause Kristina's death.

The trial court did not violate double jeopardy by convicting Roger of both first degree kidnapping and attempted first degree murder.

## III. SAME CRIMINAL CONDUCT

Roger argues that the attempted first degree murder conviction and the first degree kidnapping conviction encompassed the same criminal conduct, so for purposes of calculating his offender score, the trial court should have counted the offenses as one crime. The State responds that Roger "has waived the issue" because "he failed to make this argument before the trial court." Br. of Resp't at 18. The State further responds that Roger's convictions did not encompass the same criminal conduct because "although the crimes involved the same victim, they did not have the same criminal intent." *Id.* at 21. We agree with the State.

For purposes of calculating a defendant's offender score, if the sentencing court enters a finding that some or all of the defendant's "current offenses encompass the same criminal conduct[,] then those current offenses shall be counted as one crime." Former RCW 9.94A.589(1)(a) (2015). Crimes encompass the same criminal conduct when they "require the same criminal intent, are committed at the same time and place, and involve the same victim." *Id.*

Here, the attempted first degree murder conviction and the first degree kidnapping conviction did not encompass the same criminal conduct. As explained above, the two crimes did not involve the same intent.

Moreover, because "application of the same criminal conduct statute involves both factual determinations and the exercise of discretion," a defendant who does not argue below that their offenses encompass the same criminal conduct waives this challenge to their offender score on appeal. *In re Pers. Restraint of Goodwin*, 146 Wn.2d 861, 875, 50 P.3d 618 (2002). Given that Roger did not argue below that the convictions encompassed the same criminal conduct, he waived the challenge to his offender score.

IV. SAG ARGUMENTS

Roger's statement of additional grounds (SAG) raises a number of other claims. Among them is an assignment of error to the lifetime no-contact order covering his children. We remand for the trial court to consider on the record whether this condition violates Roger's constitutional right to parent and whether modification of the order is necessary. The remainder of Roger's claims fail.

A.      Lifetime No-Contact Order

Roger contests the lifetime no-contact order covering his children.

A trial court may impose crime-related prohibitions as part of any sentence. Former RCW 9.94A.505(9) (2019). A "trial court has the discretion to impose a crime-related prohibition up to the statutory maximum for the crime of which the defendant is convicted without resort to aggravating factors of any kind." *In re Pers. Restraint of Rainey*, 168 Wn.2d 367, 375, 229 P.3d 686 (2010). "We review the imposition of crime-related prohibitions for an abuse of discretion." *State v. Ancira*, 107 Wn. App. 650, 653, 27 P.3d 1246 (2001). However, more "careful review of sentencing conditions is required where those conditions interfere with a fundamental constitutional right." *State v. Warren*, 165 Wn.2d 17, 32, 195 P.3d 940 (2008).

Under the Fourteenth Amendment to the United States Constitution, parents have a fundamental liberty interest "in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). That right "can be restricted by a condition of a criminal sentence if the condition is reasonably necessary to prevent harm to the children." *Ancira*, 107 Wn. App. at 654.

In *State v. DeLeon*, the defendant had sexually abused his former wife's children and the trial court imposed a no-contact order covering the defendant's biological children, but the trial court did not consider the defendant's right to parent when it imposed the no-contact order. 11 Wn. App. 2d 837, 839, 456 P.3d 405 (2020). The trial court did not analyze on the record whether a no-contact order was reasonably necessary to achieve the compelling state interest in protecting the children from harm, nor did it consider whether less restrictive alternatives were available. *Id.* at 841. As a result, we held that the record was insufficient to ensure meaningful appellate review, acknowledging that on remand the trial court might conclude that less restrictive alternatives were not available. *Id.* at 841-42. Division One recently reached the same conclusion in *State v. Reedy*, where a defendant was convicted of raping and molesting his child and the trial court imposed a lifetime no-contact order covering the child. 26 Wn. App. 2d 379, 384, 386, 527 P.3d 156 (2023). Division One reasoned that while the State's interest in protecting the child "from further abuse [was] abundantly clear," there was an "outstanding factual question" about how or to what extent the trial court should have tailored the conditions related to that interest, "short of the de facto termination of [the defendant's] parental rights." *Id.* at 394-95.

Here, the trial court did not consider on the record whether a lifetime no-contact order covering Roger's children was reasonably necessary to accomplish the compelling interest in protecting them, and it did not consider whether less restrictive alternatives were available in light of Roger's right to parent. While such alternatives may not exist in light of the abundantly clear interest in protecting the children, the trial court must consider this on the record. We remand for the trial court to consider this issue and revise the no-contact order if necessary.

B.    Sufficiency of the Evidence

Roger argues that the State failed to present sufficient evidence to support his convictions. Specifically, he argues that there was insufficient evidence that he was the person who attacked Kristina while she was in the backyard, that Kristina was transported to the hospital with life-threatening injuries, that the attempted murder was premeditated, and that he was armed with a deadly weapon on the night of the incident. He also argues that Kristina did not testify credibly. We disagree and hold that there was sufficient evidence to support Roger's convictions.

"When reviewing the sufficiency of evidence in support of a conviction following a bench trial, we determine whether substantial evidence supports the challenged findings of fact and whether the findings support the trial court's conclusions of law." *State v. Smith*, 185 Wn. App. 945, 956, 344 P.3d 1244 (2015). "'Substantial evidence' is evidence sufficient to persuade a fair-minded, rational person that the findings are true." *Id.* at 956-57 (quoting *State v. Stevenson*, 128 Wn. App. 179, 193, 114 P.3d 699 (2005)). "A defendant challenging a trial court's finding of fact bears the burden of demonstrating that the finding is not supported by substantial evidence." *Id.* at 957. "A challenge to the sufficiency of evidence in support of a conviction admits the truth of the State's evidence and all reasonable inferences that can be drawn from it." *Id.*

Substantial evidence supports the finding that Roger was the person who attacked Kristina while she was in the backyard. Kristina testified that after she escaped to the backyard, she collapsed and "heard the gate latch make a noise." 5 VRP at 484. Then, "somebody appeared," stabbed her twice, and "ran off towards the side of the house where [there was] no gate in the backyard." 5 VRP at 485. When asked when she realized Roger had come back to the backyard, Kristina said it was when Roger pulled her up and stabbed her in the face. Her testimony supports

18

the finding that Roger was the person who attacked her. Russell Sage, a neighbor, testified that shortly after he heard someone scream, he saw Roger climb over the top of the fence at his house and walk away. His testimony corroborates Kristina's testimony.

Substantial evidence supports the finding that Kristina was transported to the hospital with life-threatening injuries. A paramedic who responded to the incident testified that Kristina's injuries were life-threatening. And a doctor who treated Kristina testified that after the incident, she arrived at the hospital with life-threatening stab injuries.

Substantial evidence supports the finding that the attempted murder was premeditated. "[P]remeditation is 'the deliberate formation of and reflection upon the intent to take a human life' and involves 'the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.'" *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995) (quoting *State v. Gentry*, 125 Wn.2d 570, 597-98, 888 P.2d 1105 (1995)). Premeditation "must involve more than a moment in point of time." RCW 9A.32.020(1). Kristina testified that after Roger repeatedly stabbed her and she began screaming for help in the backyard, he returned to stab her in the mouth and abdomen. It is thus reasonable to infer a premeditated intent to cause Kristina's death: by stabbing Kristina in the mouth, Roger made it harder for her to get help, and by leaving her with multiple stab wounds, he increased the likelihood that Kristina would die before help arrived.

Substantial evidence supports the finding that Roger was armed with a deadly weapon. A "deadly weapon" is "an implement or instrument which has the capacity to inflict death and[,] from the manner in which it is used, is likely to produce or may easily and readily produce death." RCW 9.94A.825. Kristina testified that Roger repeatedly stabbed her, and as stated above, a doctor

that treated Kristina on the night of the incident testified that she arrived at the hospital with life-threatening stab injuries.

We will not disturb the trial court's finding that Kristina testified credibly. "We defer to the fact finder on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Ague-Masters*, 138 Wn. App. 86, 102, 156 P.3d 265 (2007). Here, the trial court was the fact finder, and we defer to its finding that Kristina's testimony was credible.

Finally, Roger challenges a number of findings that are not crucial to the ultimate findings of guilt: that he had been evicted from an apartment, that he wore a white T-shirt on the night of the incident, that he had a knife when he walked upstairs to confront Kristina, that DW came out of his room with a phone during the incident, and that he briefly appeared in Kristina's home security footage that night. With exception to the finding that DW came out of his room already holding a phone, rather than retrieving a phone from another room,[3] substantial evidence supports these findings.[4] More significantly, even if these findings were unsupported by the record, the remaining evidence would be sufficient to uphold Roger's convictions.

There is no basis for us to reverse the convictions for insufficient evidence.

---

[3] Kristina testified, "I had assumed that as there was no other phone [upstairs], it would be my phone from my bedside table . . . So he went from his room to the bedroom to retrieve the phone." 5 VRP at 466.

[4] *See* 5 VRP at 438 (Kristina's testimony about Roger staying with her because he was facing eviction); 2 VRP at 43, 74 (neighbors' testimony about seeing Roger wearing a white T-shirt on the night of the incident); 4 VRP at 334-35 (the State offering a bloody white T-shirt into evidence); 5 VRP at 461-63 (Kristina's testimony about Roger slashing her shortly after he came upstairs); 10 VRP at 966 (statement in the trial court's oral ruling that the court viewed the home security footage "a number of times" and saw "a person in a white T-shirt running back towards the gate").

C.       Ineffective Assistance of Counsel

Roger argues that he received ineffective assistance of counsel. Roger contends that defense counsel was ineffective when he failed to object "when the trial judge stated that [he] was seen as a" person with a white T-shirt "captured on the . . . home camera video;" when Kristina identified him as the person who entered the yard and stabbed her in the mouth and abdomen; when the State offered a white T-shirt covered in blood into evidence; and when the State and Kristina said Kristina had written the word "help" on the kitchen island using her blood. Statement of Additional Grounds (SAG) at 16-17. Roger further contends that defense counsel "was on his phone heavily [throughout] trial, texting to friends and other clients." SAG at 17. Roger's claims fail.

The federal and state constitutions guarantee the right to effective assistance of counsel. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. To establish ineffective assistance of counsel, a defendant must show "'that counsel's performance was deficient' and that 'the deficient performance prejudiced the defense.'" *State v. Carson*, 184 Wn.2d 207, 216, 357 P.3d 1064 (2015) (emphasis omitted) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). To prevail, the defendant must meet both the deficiency requirement and the prejudice requirement. *Estes*, 188 Wn.2d at 457-58.

Counsel's performance was deficient if it fell "'below an objective standard of reasonableness based on consideration of all the circumstances.'" *Id.* at 458 (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). To establish that counsel performed deficiently, the defendant must show that there were no "'legitimate strategic or tactical reasons

21

supporting the challenged conduct.'" *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012) (quoting *McFarland*, 127 Wn.2d at 336). We strongly presume that counsel's representation was reasonable. *Estes*, 188 Wn.2d at 458.

### 1. Failure to object

"A few or even several failures to object are not usually cause for finding" deficient performance. *State v. Vazquez*, 198 Wn.2d 239, 250, 494 P.3d 424 (2021). For example, it is a legitimate trial tactic for an attorney to forgo objecting when they wish to avoid highlighting certain evidence. *Id.* at 248.

Here, counsel did not perform deficiently when he refrained from objecting in the instances Roger points out. When the trial court said it saw a person in a white T-shirt in the security footage, the court was delivering its ruling. Objecting would have been improper and futile. When Kristina and the State said Kristina wrote the word "'help'" on the kitchen island using her blood and when Kristina identified Roger as the person who stabbed her while she was in the yard, it was reasonable for counsel to refrain from objecting to avoid highlighting this particularly graphic evidence, which was not in Roger's favor. 5 VRP at 475; 9 VRP at 879.

Additionally, Roger does not state what basis counsel would have had for objecting when the State offered the white T-shirt into evidence. Multiple witnesses testified that Roger was wearing a white T-shirt on the night of the incident, and a deputy sheriff who arrested Roger the next day testified that during the arrest, Roger was wearing the T-shirt the State offered. Given the amount of evidence that Roger was wearing a white T-shirt when he committed the crimes, it would have made little sense for defense counsel to object to this evidence in an attempt to argue that Roger was misidentified.

2.      <u>Inattentiveness at trial</u>

Roger argues that during trial, "as testimony was underway, counsel opened an attachment on his phone and . . . [he] could hear a person talking." SAG at 17. "The trial judge then asked counsel if he needed [a] moment." *Id.* In arguing that defense counsel was ineffective because he was on his phone throughout trial, Roger references a portion of the trial transcript noting a "[p]hone noise disturbance" during Kristina's testimony. 5 VRP at 437. The State's attorney said, "Go ahead and go outside." *Id.* The trial court asked defense counsel if he needed a moment, and defense counsel replied, "I'm turning it off." *Id.* The State's attorney then continued her direct examination of Kristina.

The transcript does not give a clear indication of what took place, and Roger does not support his argument with additional record citations to establish his counsel's alleged inattentiveness. His argument thus appears to depend on facts outside our record, and it cannot be resolved on direct appeal.

D.      <u>Additional Trial-Related Claims</u>

Roger raises several claims related to his bench trial. We conclude that these claims lack merit.

1.      <u>Judicial bias</u>

Roger argues that he did not receive a fair trial because the trial court judge was biased against him. He reasons that the judge referred to Kristina "as the 'victim'" during trial and that the "judge failed to disclose that she was previously a prosecutor" or that she was "part of a woman's victim . . . organization." SAG at 1b. We conclude that Roger has not established bias.

"Criminal defendants have a due process right to a fair trial by an impartial judge." *In re Pers. Restraint of Swenson*, 158 Wn. App. 812, 818, 244 P.3d 959 (2010). "'Impartial' means the absence of actual or apparent bias." *Id.* (quoting *State v. Moreno*, 147 Wn.2d 500, 507, 58 P.3d 265 (2002)). We presume "that a trial judge properly discharged [their] official duties without bias." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1 (2004). "The party seeking to overcome that presumption must provide specific facts establishing bias." *Id.*

Roger has not overcome the presumption that the trial court judge was impartial. The judge referring to Kristina as the victim once during a two-and-a-half-week trial does not establish bias. And there is no information in our record about whether the judge was previously a prosecutor or involved in any particular organizations, so we cannot evaluate Roger's arguments on those subjects on direct appeal. A personal restraint petition is the appropriate vehicle for claims based on facts outside the record.

2.    Right to remain silent

Roger argues that the trial court violated his right to remain silent under the Fifth Amendment to the United States Constitution because it found, based on his demeanor, that he was not credible. He contends that a person's "demeanor equates to a form of communication" and if a person "[chooses] to be emotionless, it should be their right and not used against" them. SAG at 7. We disagree.

As stated above, we defer to the fact finder's determinations of witness credibility. *Ague-Masters*, 138 Wn. App. at 102. In determining whether a defendant who testifies is credible, the fact finder is entitled to consider the defendant's manner while they testify. *See State v. Barry*, 183 Wn.2d 297, 305, 352 P.3d 161 (2015).

In this case, the judge was the fact finder, and she was entitled to make a credibility determination based on Roger's demeanor while he testified. We will not disturb this credibility determination on appeal.

3.     Trial transcript availability

Roger argues that his due process rights have been violated because the portion of the trial transcript "that captured [Kristina's] testimony of [him] calling the police went missing." SAG at 15. Roger appears to claim that there was a transcription error. His argument necessarily relies on information outside of our record, so we cannot address it on the merits. A personal restraint petition is the appropriate vehicle for this claim.

CONCLUSION

We remand for the trial court to consider on the record whether the lifetime no-contact order covering Roger's children was reasonably necessary in light of his right to parent and whether modification of the order is needed. We otherwise affirm.

No. 56665-6-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Veljacic, J.

Che, J.